**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | 3:19CR002248(JCH) |
| v. | : | |
| | : | |
| OMAYRA SANTIAGO | : | JANUARY 14, 2021 |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

**I.**     **INTRODUCTION**

The defendant, Omayra Santiago, in accordance with Rule 32(o) of the Local Rules of Criminal Procedure, submits this memorandum in aid of sentencing scheduled for January 28, 2021.

On October 3, 2019, Ms. Santiago pleaded guilty to one-count of mail fraud in violation of Title 18 U.S.C. § 641. The parties entered into a Plea Agreement Letter dated October 3, 2019. The defendant waived her right to indictment. Ms. Santiago and the Government agreed as to the Federal Sentencing Guidelines Calculations as well as Ms. Santiago's Criminal History Category Level. The parties agreed that her total offense level under the Guidelines is 12 and her Criminal History Category Level is Level 1.

Ms. Santiago respectfully submits that factors exist which make her case appropriate for a sentence below the Guidelines range, and that the

appropriate sentence is one in which Ms. Santiago is placed on probation.

The grounds for a sentence below the Guidelines range are as follows:

1. Ms. Santiago's case is outside the "heartland" of cases for the instant offense;

2. Ms. Santiago's actions constituted aberrant behavior;

3. Because there are extraordinary family circumstances present, a sentence below the Guidelines range is justified so that Ms. Santiago may maintain the necessary emotional commitment and support for her family.

4. A combination of factors supports a sentence below the Guidelines range.

## II. THE APPLICABILITY OF THE FEDERAL SENTENCING GUIDELINES

The manner in which criminal defendants are sentenced in federal court has changed.  In the case of *United States v. Booker*, 125 S.Ct. 738 (2005), the United States Supreme Court held, in the first of two majority opinions, that the Sixth Amendment is violated when an enhanced sentence is imposed under the Guidelines based upon judicially determined facts.  *Id.* at 756.  In the second majority opinion, a different majority of the Court concluded that based upon the first majority's constitutional holding, the appropriate remedial measure required the severance and excision of two provisions of the federal sentencing statute, including 18 U.S.C. Section 3553(b)(1), the

provision that made the Federal Sentencing Guidelines mandatory. *Id.* at 756-57. As such, the Court stated that so modified, the Guidelines were to be considered advisory rather than mandatory. *Id.* at 757. Thus, while the federal sentencing statute "requires a sentencing court to consider Guidelines ranges, … it permits the court to tailor the sentence in light of other statutory concerns as well…." *Id.*

In accordance with *Booker* and the mandate of 18 U.S.C. Section 3553(a), a district court must consider a variety of factors in imposing a sentence, including: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to satisfy certain articulated purposes such as to reflect the seriousness of the offense, to provide deterrence, or to protect the public; (3) the kinds of sentences available; (4) the kinds of sentences and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the Guidelines; (5) any pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3353(a); *see also*

*United States v. West*, 2005 WL 180930, at *2 (S.D.N.Y. Jan. 27, 2005) (citing *United States v. Ranum*, 353 F. Supp.2d 894 (E.D. Wis. 2005).

The ruling in *Booker* directs courts to consider all of the Section 3553(a) factors, many of which the Guidelines either reject or ignore. *United States v. Ranum*, 353 F. Supp. 2d at 985-86.   For example, pursuant to Section 3553(a)(1), a sentencing court must consider the "history and characteristics" of the defendant. *Id.* at 986 (quoting 18 U.S.C. § 3553(a)(1)).  However, under the Guidelines, courts are generally forbidden to consider a defendant's age; U.S.S.G. § 5H1.1; his education; *id.* § 5H1.2; his mental and emotional condition; *id.* § 5H1.3; his physical condition; *id.* § 5H1.4; his employment record; *id.* § 5H1.5; his family ties and responsibilities; *id.* § 5H1.6; his socio-economic status; *id.* § 5H1.10; and his civic contributions; *id.* § 5H1.11.  *United States v. Ranum*, 353 F. Supp. 2d at 986.

The *Ranum* court stated:

The guidelines' prohibition of considering these factors cannot be squared with the § 3553(a)(1) requirement that the court evaluate the 'history and characteristics' of the defendant.  The only aspect of a defendant's history that the guidelines permit courts to consider is criminal history.  Thus, <u>in cases in which a defendant's history and character are positive, consideration of all of the § 3553(a) factors might call for a sentence outside the guideline range</u>.

*Id.* (emphasis added).  The *Ranum* court further noted that Section 3553(a)(7)

directs courts to consider the need to provide restitution.  *Id.*  The court noted,

"**In many cases, imposing a sentence of no or only a short period of**

**imprisonment will best accomplish this goal by allowing the defendant to**

**work and pay back the victim**.  The guidelines do not account for this.  In

fact, the mandatory guideline regime forbids departures to facilitate

restitution."  *Id.* (citing *United States v. Seacott*, 15 F.3d 1380, 1388-89 (7th Cir.

1994)(emphasis added).  The Second Circuit has also noted that the non-

mandatory nature of the Guidelines now makes it unnecessary for a

sentencing judge to adhere strictly to Guidelines ranges that are dependent

upon precise calculations of monetary losses. *United States v. Crosby*, 397 F.3d

103, 112 (2d Cir. 2005).

> The Second Circuit has stated:

> [T]he excision of the mandatory aspect of the Guidelines does
> not mean that the Guidelines have been discarded.  On the
> contrary, sentencing judges remain under a duty with respect to
> the Guidelines – not the previously imposed duty to apply the
> Guidelines, but the continuing duty to "consider" them, along
> with the other factors listed in section 3553(a).

*Id.* at 111.  The guidelines are to be treated "as just one of a number of

sentencing factors."  *United States v. West*, 2005 WL 180930, at *2.  "[C]ourts

are free to disagree, in individual cases and in the exercise of discretion, with

the actual range proposed by the guidelines, so long as that the ultimate sentence is reasonable and carefully supported by reasons tied to the § 3553(a) factors." *United States v. Ranum*, 353 F. Supp. 2d at 987; *see also United States v. Jones*, 352 F. Supp.2d 22, 25-26 (D. Me. 2005) (reviewing the factors identified in subsection 3553(a) "in determining whether to apply the now advisory Guidelines" and concluding that the Guidelines would not be followed under the circumstances of the case).

The Second Circuit has ruled that in order to fulfill its statutory duty to consider the Guidelines, a sentencing judge will normally have to determine the Guidelines range applicable to the offense. *United States v. Crosby*, 397 F.3d at 111. "A judge cannot satisfy this duty by a general reference to the entirety of the Guidelines Manual, followed by a decision to impose a 'non-Guidelines sentence.'" *Id.* A judge is further permitted to engage in any fact-finding necessary for consideration of the Guidelines and Section 3553(a). *Id.* at 112.

The Second Circuit summarized the issues that must be considered by a sentencing judge after *Booker*:

> First, the Guidelines are no longer mandatory. Second, the sentencing judge must consider the Guidelines and all of the other factors listed in section 3553(a). Third, consideration of the Guidelines will normally require determination of the

> applicable Guidelines range, or at least identification of the arguably applicable ranges, and consideration of applicable policy statements. Fourth, the sentencing judge should decide, after considering the Guidelines and all the other factors set forth in section 3553(a), whether (i) to impose the sentence that would have been imposed under the Guidelines, *i.e.*, a sentence within the applicable Guidelines range or within permissible departure authority, or (ii) to impose a non-Guidelines sentence. Fifth, the sentencing judge is entitled to find all the facts appropriate for determining either a Guidelines sentence or a non-Guidelines sentence.

*Id.* at 113.

Therefore, for the purposes of this Memorandum, although their application is not mandatory, Ms. Santiago addresses various factors that are set forth in the Federal Sentencing Guidelines, as well as the case law interpreting those factors, as a framework for her arguments and in order to assist the Court in considering the Guidelines. The arguments advanced by Ms. Santiago also fall squarely within the points that this Court is required to consider pursuant to 18 U.S.C. Section 3553(a).

## III.  THE DEFENDANT'S VERSION OF THE OFFENSE

The defendant does not dispute that facts contained in the Presentence Report. However, it is important to note the defendant's motivation for committing the offense. Her conduct was motivated by feelings of helplessness and despair with respect to her financial condition at the time of

the offense.  She explains her conduct more fully in a letter to the Court attached hereto as Exhibit A.  That is verified by the letter of the father of her children Eduardo Troche, which is attached hereto as Exhibit B.  In short, the relationship between Ms. Santiago and Mr. Troche, while long lasting was tumultuous and during a number of years of the alleged offenses Mr. Troche and Ms. Santiago did not co-habitate and Mr. Troche did not contribute toward the family finances.  It was for that reason that Ms. Santiago did not believe that she was violating the law when making the applications and redeterminations.  For instance, from 2003 to 2018 Ms. Santiago had addresses at 194 Prospect Street and 208 Hope Street in Waterbury, Connecticut.  However, during that time period Mr. Troche had addresses at 450 Hill Street and 129 Pine Street, in Waterbury, Connecticut as evidenced by his tax returns and driver's license.  *See.* Copies of Troche documents, Exhibit C.  Admittedly, from 2003-2018 Ms. Santiago and Mr. Troche were co-habituating for significant periods of time, but that could change with almost no notice or preparation.  That being said, Ms. Santiago now understands that it was a violation of the law and is taking full responsibility for her actions.  *See* Letter of Ms. Santiago, Exhibit A.  Unfortunately, she chose to supplement

her financial needs with monies misappropriated from the Social Security Administration., a decision she deeply regrets today.

IV.   **THE PARTICULAR FACTS AND CIRCUMSTANCES OF THIS CASE AS WELL AS THE CHARACTER OF MS. SANTIAGO AND COMPELLING CONSIDERATIONS WARRANT THIS COURT TO IMPOSE A SENTENCE BELOW THAT WHICH IS PRESCRIBED BY THE RECOMMENDED OFFENSE LEVEL**

   A.   **This Court Possesses Authority to Depart From The Guidelines Range**

Prior to the decision in *Booker*, a district court was required to impose a sentence within the applicable Sentencing Guidelines range. *See* U.S.S.G. Ch. 1, Pt. A, intro., p.s.; 18 U.S.C. §3553(b). Now, the court is not bound by rigid application of the Guidelines.   "The Commission intends the sentencing courts to treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes." *See* U.S.S.G. Ch.1, pt.A, intro. comment 4(b); *see also United States v. Bryson*, 163 F.3d 742, 47 (2d Cir. 1998); *United States v. Payton*, 159 F.3d 49, 60 (2d Cir. 1998); *United States v. Rogers*, 972 F.2d 489, 493 (2d Cir. 1992). "When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted." *Id*.  Although a sentence within the Guidelines range is no longer mandatory, this Court may still consider whether Ms. Santiago's

case falls within or without the "heartland" of typical cases in determining his sentence.

In forming the Guidelines, the Sentencing Commission did not adequately take into account cases that are, for one reason or another, "unusual." *See Koon v. United States*, 518 U.S. 81, 93 (1996) (citing 1995 U.S.S.G. Ch. 1, pt. A, intro. comment 4(b)). The Commission did not intend, with the exception of certain factors (race, sex, national origin, creed, religion, socioeconomic status, lack of guidance as a youth, drug or alcohol dependence, and economic hardship), "to limit the kinds of factors, whether or not mentioned anywhere else in the Guidelines, that could constitute grounds for departure in an unusual case." *Koon v. United States*, 518 U.S. at 83 (quoting 1995 U.S.S.G. Ch. 1, pt. A, intro. comment 4(b)).

In *Koon* the United States Supreme Court further recognized that:

[T]he [Sentencing Reform] Act authorizes the district courts to depart in cases that feature aggravating or mitigating circumstances of a kind or degree not taken into consideration by the Commission.  The Commission, in turn, says it has formulated each guideline to apply to a heartland of typical cases. Atypical cases were not "adequately taken into consideration," and factors that may make a case atypical provide potential basis for departure. Potential departure factors "cannot by their very nature, be comprehensively listed and analyzed in advance." Faced with this reality, the Commission chose to prohibit consideration of only a few factors, and not otherwise to limit, as a categorical matter, the considerations that might bear upon the decision to depart.

*Koon*, 518 U.S. at 94 (internal citations omitted).

In *Koon*, the Court adopted the Commission's summary of the way in which courts should consider certain factors in determining whether to depart downward. With respect to factors that might remove a case from the heartland of typical cases, the Court referred to them as "special factors." "If a special factor is an encouraged factor, the court is authorized to depart if the applicable guideline does not already take it into account." *Id.* at 96. On the other hand, "[i]f a special factor is a discouraged factor, or an encouraged factor already taken into account by the applicable guideline, the court should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." *Id.* at 96.

The *Koon* Court also recognized the importance of adopting, as a reviewing court, a deferential approach to afford the district court the necessary flexibility to resolve questions involving "multifarious, fleeting, special, narrow facts that utterly resist generalization." *Id.* (citing *Cooter* and *Gell v. Hartmarx Corp.*, 496 U.S. 384(1990)).   The Second Circuit Court of Appeals has agreed with the notion that district courts should be allotted "wide discretion" in determining what aggravating and mitigating

circumstances to consider when deciding whether to depart from the Guidelines. *See United States v. Bryson*, 163 F.3d 742, 746-47 (2d Cir. 1998); *United States v. Payton*, 159 F.3d 49, 60 (2d Cir. 1998); *United States v. Schular*, 907 F.2d 294, 296 (2d Cir. 1990).

In *United States v. Correa-Vargas*, 860 F.2d 35, 37 (2d Cir. 1988), the Second Circuit Court of Appeals stated the following:

> [W]e prefer to allow the district courts to exercise their sound judgment in departing from the Guidelines, rather than impose rigid adherence to a table of numbers, Only by allowing the district courts **sensible flexibility** can we promote the equally important purposes of just punishment, respect for the law and adequate deterrence set forth in the Sentencing Reform Act.

*United States v. Correa-Vargas*, 860 F.2d at 37 (emphasis added). *See also United States v. Rogers*, 972 F.2d 485, 493 (2d Cir. 1992) ("the authority to depart provides a 'sensible flexibility' to insure that atypical cases are not shoehorned into a Guidelines range that is formulated only for typical cases"). Furthermore, the Second Circuit has noted that "it was not Congress' aim to straitjacket a sentencing court, compelling it to impose sentences like a robot inside a Guidelines' glass bubble, and preventing it from exercising

discretion, flexibility or independent judgment."[1]   *United States v. Lara*, 905 F.2d 599, 604 (2d Cir. 1990).

Therefore, "[t]he controlling decision as to whether and to what extent departure is warranted can only be made by the courts" at the time of sentencing. U.S.S.G. §5K2.0, p.s.; *See also Rogers*, 972 F.2d at 495 ("the traditional role of the district judge in bringing compassion and common sense to the sentencing process" has survived the guidelines' promulgation); *United States v. Mickens*, 977 F.2d 69, 73 (2d Cir. 1992) (remanding case to give sentencing court "opportunity to fulfill the traditional role of a district judge in bringing compassion and common sense to the sentencing process").

In the present case, the Court is required to consider, among other things, the "nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1). Analysis of the present offense demonstrates that Ms. Santiago's conduct is outside the "heartland" of typical theft and conversion of public funds cases. As discussed above, Ms. Santiago used a large amount of the money to pay

---

[1] Likewise, the Fifth Circuit has noted:

> Sentencing under the Guidelines is not, however, an exact science.  Justice cannot be meted out according to mathematical formulas.  The universe of potential factors that might affect the seriousness of a given offense is too broad to be refined to a mechanistic approach.  The Sentencing Guidelines are not intended to cover all contingencies or rigidly bind district judges. The Guidelines do not impose the sentence; they provide a framework for a district court to impose a sentence.

*United States v. Mejia-Orosco*, 867 F.2d 216, 219 (5th Cir. 1989).

for living expenses.  Also, as discussed more fully below, Ms. Santiago is a hardworking and dedicated individual who did not exhibit any signs of untrustworthiness or deception indicating that the conduct that gave rise to this conviction was an aberration and a result of the unstable family conditions existing at the time of this offense.

In the present case, Ms. Santiago did not act solely for personal gain. Although, concededly, a portion of the money went to Ms. Santiago personally, as discussed above, a significant amount of the funds were used for the payment of living expenses for her three developmentally disabled children.

**B.** **In Determining Ms. Santiago's Sentence, This Court Must Evaluate Her Character**

The character of the defendant is a significant factor in the determination of an appropriate sentence and must be taken into consideration by the sentencing court.  *See* 18 U.S.C. § 3553(a)(1).  "Contrary to widely held belief, the Sentencing Reform Act did not abolish consideration of the character of the defendant in sentencing."[2] *United States v.*

---

[2] *See also* John M. Walker, Jr., Loosening *The Administrative Handcuffs: Discretion And Responsibility Under The Guidelines*, 59 Brooklyn L. Rev. 551 (1993).  In this law review article, Judge Walker wrote, "[o]ur cases make clear that the Guidelines have both transformed judges into computers confined to connecting dots on a grid when fashioning a sentence. Rather, judges retain the discretion and indeed are required, to consider each defendant as an

*Merritt*, 988 F.2d 1298, 1307 (2d Cir.), *cert. denied*, 113 S. Ct. 2933 (1993); *see also United States v. DeRiggi*, 45 F.3d 713, 718 (2d Cir. 1994). Rather, the Court of Appeals for the Second Circuit has noted that "the Act clearly ordered that the characteristics of the defendant were to be a central consideration in the fashioning of a just sentence." *Id.; see, e.g.*, U.S.S.G. §1B1.4 (the Commission provided that in determining whether a departure from the Guidelines is warranted, the sentencing court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law); *see also* 18 U.S.C. § 3661.

Further, in another case, the Court of Appeals for the Second Circuit emphasized that the Sentencing Commission "has not yet completely eradicated judicial discretion from our system." *United States v. Anderson*, 15 F.3d 278, 280 (2d Cir. 1994).[3] The Court stated:

---

individual and to fashion each sentence accordingly." Walker, *supra*, at 553. He further stated:

> Critics contend that the Guidelines virtually abolish consideration for the defendant's character and, instead, require judges to fashion sentences based largely upon the offense and not the offender. This view is widely held by district judges and tends to be self-fulfilling. The unfortunate result is that judges are inadvertently failing to carry out the congressional mandate to consider 'the nature and circumstances of the offense *and the history and characteristics of the defendant* when imposing a sentence.

Walker, *supra*, at 558 (emphasis added).

[3] *See also Rogers*, 972 F.2d at 495 ("[i]n the tangled wake of the Sentencing Guidelines, there is a danger that district judges will conclude in frustration that [the traditional role in bringing

The fact that the Sentencing Reform Act has not completely removed judicial discretion from our system, of course, is for the best; although judicial discretion undoubtedly may result in some sentencing disparities, it is also that which enables our courts to fashion individualized sentences essential to just administration of the criminal law.

*Anderson*, 15 F.3d at 280 (emphasis added).

In *Merritt*, the Court of Appeals examined both the statutory scheme of the Sentencing Reform Act and the test of the Federal Sentencing Guidelines and reiterated that a district judge must consider a defendant's individual characteristics.  First, the Court noted that the Senate Report to the Sentencing Act specifically ordered that the characteristics of the defendant were to be considered in determining a just sentence. *See Merritt*, 988 F.2d at 1307.  The Senate Report provided:

The Committee does not intend that the Guidelines be imposed in a mechanistic fashion.  It believes that the sentencing judge has an obligation to consider all the relevant factors in a case and to impose a sentence outside the Guidelines in an appropriate case.  The purpose of the Sentencing Guidelines is to provide a structure for evaluating the fairness and appropriateness of the sentence for an individual offender, ***not to eliminate the thoughtful imposition of individualized sentences***.

S. Rep. No. 225, 98th Cong., 2d Sess. 52, *reprinted in* 1984 U.S. Code Cong. &

---

compassion and common sense to the sentencing process] has been eradicated").

Admin. News 3182, 3236 (emphasis added); *see also Merritt*, 988 F.2d at 1307

n.3;

*United States v. Lara*, 905 F.2d at 604 (2d Cir. 1990).

The *Merritt* Court also reviewed 18 U.S.C. § 3553, "[t]he keystone section in the creation of the new sentencing system." Section 3553 provides *inter alia* the following guidelines in imposing sentences:

(a) Factors to be considered in imposing a sentence. - The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider -

    (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

    (2) the need for the sentence imposed-

        (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

        (B) to afford adequate deterrence to criminal conduct;

        (C) to protect the public from further crimes of the defendant; and

        (D) to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

The Court focused on the statutory mandate of § 3553(a)(1) that the "characteristics of the defendant" are factors to be considered in imposing a sentence. *Merritt*, 988 F.2d at 1306-07.

The *Merritt* Court also reviewed the Guidelines, Policy Statements, Application Notes, and Commentary formulated by the Sentencing Commission and observed that there is little guidance regarding the use of a defendant's characteristics. Nevertheless, the Court concluded that "the absence of Guideline commands for the defendant characteristics represents the Commission's wise judgment that it is far more difficult to quantify the effect that such characteristics should have on individual sentences, than it is to prescribe relative values to a variety of offenses." *Merritt*, 988 F.2d at 1309.

Accordingly, in the present case, the character of Ms. Santiago should be examined and considered in determining a just sentence.

C. **Because Ms. Santiago's Character And Conduct Fall Outside Of The "Heartland" of Guideline Cases, This Court Possesses Authority to Sentence Ms. Santiago Below The Guidelines Range On The Basis Of Any Of The Following Asserted Grounds**

1. **Ms. Santiago's Offense Conduct Was an Aberration**

The circumstances of this case justify a reduced sentence on the basis of aberrant behavior. The Guidelines provide, "A sentence below the

applicable guideline range may be warranted in an extraordinary case if the defendant's criminal conduct constituted aberrant behavior."   U.S.S.G. § 5K2.20.  A court may not depart, however, if the offense (1) involves serious bodily injury or death; (2) the defendant discharged a firearm or otherwise used a firearm or a dangerous weapon; (3) the offense of conviction is a serious drug trafficking offense; (4) the defendant has more than one criminal history point; or (5) the defendant has a prior federal or state felony conviction.  U.S.S.G. § 5K2.20.  None of these disqualifying factors are present in the instant matter.

In its application notes, the Commission defines aberrant behavior as "a single criminal occurrence or single criminal transaction that (A) was committed without significant planning; (B) was of limited duration; and (C) represented a marked deviation by the defendant from an otherwise law-abiding life." U.S.S.G. § 5K2.20 cmt. (n.1).  The application notes also set forth various characteristics of the defendant that the sentencing court may consider in determining whether to depart for aberrant behavior, such as: "(A) mental and emotional conditions; (B) employment record; (C) record of prior good works; (D) motivation for committing the offense; and (E) efforts to mitigate the effects of the offense."   U.S.S.G. § 5K2.20 cmt. (n.2). In

applying each of these factors to this case, it is apparent that Ms. Santiago's conduct constitutes "aberrant behavior."

> ### a.   Ms. Santiago's Conduct Is Within The Guidelines' Definition Of "Aberrant Behavior"

Ms. Santiago's offense, was a "single criminal occurrence" or a "single criminal transaction."  *See* U.S.S.G. § 5K2.20 cmt. (n.1).  Although the conduct occurred over a period of time, it was a single criminal transaction because it was one criminal scheme.  *See United States v. Hued*, 338 F. Supp.2d 453, 458 (S.D.N.Y. 2004) ("Furthermore, the Sentencing Commission has, in other contexts, intended the word "single" to refer to the crime committed and not to the various acts involved.") (internal quotations omitted).  Ms. Santiago's acts were "of limited duration."  *See* U.S.S.G. § 5K2.20 cmt. (n.1).  Finally, Ms. Santiago's conduct "represented a marked deviation by the defendant from an otherwise law-abiding life."  *See id.*  As the Presentence Report indicates, Ms. Santiago has no criminal convictions and zero criminal history points.  Thus, Ms. Santiago's conduct fits squarely within the Guidelines' definition of "aberrant behavior."

> ### b.   The Characteristics of the Defendant Warrant the Application of the Aberrant Behavior Departure

As indicated above, the sentencing court is permitted to take various characteristics of the defendant into account in determining the application of the aberrant behavior departure. *See* U.S.S.G. § 5K2.20 cmt. (n.2). Considerations of these characteristics as they apply to Ms. Santiago demonstrate that the departure is appropriate in this case.

### 1.    Mental and Emotional Condition

During 2002, which includes the time period relevant to the instant offenses to which Ms. Santiago has plead guilty, Ms. Santiago was going through a difficult period in her life in that she was experiencing substantial physical and mental health issues that required regular doctor visits and medication in order to treat.  As noted in paragraph 49 of the Presentence Report, Ms. Santiago has suffered from depression since 2012 and has been prescribed Cymbalta for nerve pain and depression.  She also had a motor vehicle accident in 2012 which cause her significant pain and lead to issue bonding with her daughter as she was in a neck collar while recovering from surgery for cervical stenosis.  She has met with a therapist at Tides of Mind Counseling in Waterbury, Connecticut to discuss her issues.

Further, the financial constraints that her family was under as well as the financial demands placed upon her only exacerbated the depression

issues she was dealing with.  The combination of these many factors had a significant detrimental effect on her then existing mental and emotion condition.  This, in turn, took quite a toll on Ms. Santiago.  These emotional factors that existed at the time caused Ms. Santiago to bow to a lapse in judgment and commit the instant offense.

### 2.    Employment Record

Prior to the incident that gives rise to the present charges, Ms. Santiago enjoyed a law-abiding life and a consistent work history characterized by a positive work ethic.

With the exception of gaps for medical issues and caring for her children, Ms. Santiago has maintained regular employment.  Ms. Santiago has worked as a store clerk, a factory worker, a caregiver and as a home aide. Since 2018 she has been employed as a caregiver by Almost Family in Waterbury, Connecticut working at least 30 hours a week making $11.00 per hour.

### 3.    Record of Prior Good Works

Ms. Santiago's commitment to good works is evident.  Her good deeds are also recognized by her family and friends.  She is there for her friends and

family in good times and bad.   Words used to describe her include, "supportive, honest, respectful, motivator, humble, caring and loving." The letters speak for themselves, but clearly Ms. Santiago has a support system around her that appreciates her presence and understands that 1 mistake does not undo 43 years of good deeds and character. *See* Letters of Friends and Family, Exhibit D.

### 4.      <u>Motivation for Committing the Offense</u>

Ms. Santiago's actions were not motivated by a desire to do harm. Rather, much of her conduct was the result of frustration, poor judgment and concern for her children in the face of personal crisis.   Ms. Santiago did not intend to harm anyone with her actions.   She only wanted safety and security for her children.   As her relationship with Mr. Troche was very unstable she did not when he would come and go and therefore didn't consider his support to be consistent when she was applying for benefits. *See* Letter of Ms. Santiago, page 1, Exhibit A.   Further she did not commit this offense with the intention of becoming rich or buying lavish items.

Ms. Santiago made a poor decision when she fraudulently obtained public funds.   Her motivation was primarily to defray the costs of raising

three children at least partially on her own and remain financially secure in this difficult time and a good faith belief that because Mr. Troche was not a stable provider for the family that she genuinely qualified for the benefits.

### 5.   Efforts to Mitigate the Effects of the Offense

Ms. Santiago has made efforts to mitigate the effects of her offense. She has accepted responsibility for her actions and cooperated fully with both CitiFinancial investigators and the Government.  In fact, the Government has agreed to recommend a two-level departure pursuant to Section 3E1.1(a) of the Guidelines for Ms. Santiago's acceptance of responsibility.  She and Mr. Troche have attempted to borrow money against the family home owned by Mr. Troche in an attempt to make restitution.  Those efforts are on-going as of today and only have been foiled by the substandard credit score of Mr. Troche.  Even as of the writing of this memorandum Mr. Troche is making efforts to improve his credit score so that restitution can be made to the Social Security Administration.

For all of the above reasons, Ms. Santiago submits that a sentence lower than the Guidelines level is appropriate because her actions constituted aberrant behavior.

### 6.   There Are Extraordinary Family Circumstances Present

Under U.S.S.G. § 5H1.6, "[f]amily ties and responsibilities and community ties are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." Nevertheless, "[i]n this circuit a district court may depart downward in sentencing a defendant due to extraordinary family circumstances." *United States v. Walker*, 191 F.3d 326, 338 (2d Cir.1999); *see also United States v. Sprei*, 145 F.3d 528, 535 (2d Cir.1998) ("We have in the past upheld departures based on family circumstances where the family was uniquely dependent on the defendant's ability to maintain *existing financial and emotional commitments*.") (emphasis added); *United States v. Johnson*, 964 F.2d 124 (2d Cir. 1992) (affirming district court's determination that extraordinary family circumstances and responsibilities warranted a ten level downward departure); *United States v. Alba*, 933 F.2d 1117 (2d Cir. 1991) (the district court's reliance upon the defendant's family circumstances wherein he supported his wife, two children, his mother and disabled grandfather by working two jobs constituted legitimate ground for downward departure from the guideline range of 41-51 months to six months in a halfway house).

Ms. Santiago is also the primary care taker for her children, all of whom are developmentally disabled. While both she and her husband work,

she remains the parent who is most responsible for the couple's children, specifically the minor having the initials E.G.T who was born in 2013.  She has an especially active role in her youngest child's life in light of the development difficulties.  By working with E.G.T.'s teachers and taking an active role in her child's education, Ms. Santiago has been able to ensure that her child continues learn at an appropriate level.

Financially, both her and her and Mr. Troche work full time to provide for their children.  Clearly without Ms. Santiago's presence the family would suffer financially and emotionally.

7.      **Covid-19 Global Pandemic**

The fourth purpose of federal sentencing is "to provide the defendant with needed training, medical care, or other correctional treatment in the most effective manner." As noted in the PSR, Ms. Santiago does not suffer from any serious or chronic medical conditions or illnesses. PSR Paragraph 49 She does, however, participate in mental health treatment. It does not appear that Ms. Santiago is in need of medical care or correctional treatment. That being said, this Court should consider the current COVID-19 pandemic and the impact it has had on the Bureau of Prisons when deciding how much incarceration is necessary in this case. It is well documented that viruses such

as COVID-19 are very difficult to control in prison settings due to the confined spaces and the need for interaction between inmates and staff.[4] As a result, the Attorney General has issued a Memorandum to the BOP encouraging the transfer of inmates to home confinement where appropriate and many states and judicial bodies, facing the same issue in their prison systems, have encouraged judges and prosecutors to consider home confinement and other alternatives to incarceration.[5]

Importantly, this Court should also consider that any time Ms. Santiago spends in the custody of the Bureau of Prisons will be served very differently than time served before the COVID-19 pandemic. Social visits have been suspended. Inmate internal movement has also been suspended,

---

[4] As several courts have acknowledged, citing experts including the Center for Disease Control and Prevention ("CDC"), "correctional and detention facilities 'present[] unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors.'" United States v. Kennedy, Case No. 18-20315, Case No. 2020 WL 1493481 at *2 (E.D. Mich. Mar. 27 2020) (quoting CDC, "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities") (Mar. 23, 2020)). "These include: low capacity for patient volume, insufficient quarantine space, insufficient on-site medical staff, highly congregational environments, inability of most patients to leave the facility, and limited ability of incarcerated/detained persons to exercise effective disease prevention measures (e.g., social distancing and frequent handwashing)." Id.

[5] Office of the Attorney General of the United States. Memorandum to Director of the Bureau of Prisons. March 26, 2020. https://www.justice.gov/file/1262731/download

with the exception of movement for federal and state hearings and as necessary to manage space in the various facilities.[6] Without movement, inmates are essentially serving a form of solitary confinement with little interaction with other inmates and virtually no programming opportunities. Incarceration, before or after sentencing, is inherently inconsistent with the social distancing measures promulgated by the CDC to prevent spread of the virus. See United States v. Fellela, 2020 WL 1457877, *1, 19-cr-79 (JAM) (D. Conn. March 20, 2020). See also Martinez-Brooks v. Easter, --- F. Supp. 3d - --, 2020 WL 2405350, *4 (D. Conn. May 12, 2020) (MPS). Being housed in such facilities is also inherently inconsistent with the CDC promulgations regarding the congregating of persons. See United States v. Gonzalez, 2020 WL 2511427, *3, 17-cr-00062 (JAM) (D. Conn. May 15, 2020) ("congregate prison environment is inherently unsuited to protecting against the COVID-19 virus"). Risks for the virus and disease also emanate from the changing detention/prison population, and well as the risks attendant to facility

---

[6] See BOP COVID-19 Modified Operations Plan, https://www.bop.gov/coronavirus/covid19 _status.jsp (last visited June 8, 2020).

employees, contractors, and vendors leaving and reentering the facility.[7] An incarcerated individual has no personal control over these elements of risk.

the Bureau of Prisons has encountered significant difficulties with the spread of the corona virus and the COVID-19 disease. While the DOJ has identified certain BOP facilities that have had extraordinary levels of disease among both inmates and staff, the BOP itself, as of October 27, 2020, has identified hundreds of locations across the country that have had a total of 17,240 inmates and 2,196 staff who have testified positive for COVID-19, with 129 inmate deaths and 2 staff deaths. https://www.bop.gov/coronavirus/.9 These numbers exclude, among others, inmates being held in privately managed prisons under contract with the BOP. The characteristics of the virus combined with the characteristics of prison facilities combine to create significant risk. Martinez-Brooks v. Easter, --- F. Supp. 3d ----, 2020 WL 2405350, *4 ("[t]he risk posed by infectious diseases in jails and prisons is significantly higher than in the community, both in terms of risk of transmission, exposure, and harm to individuals who become infected.").

---

[7] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidancecorrectional-detention.html.

One Court, noting expert evidence before it, described the circumstances this way:

> Facilities, including jails, prisons, and other closed settings are associated with high transmission probabilities for infectious diseases. A number of features of these facilities can heighten risks for exposure, acquisition, transmission, and clinical complications of these infectious diseases. These include physical/mechanical risks such as overcrowding, population density in close confinement, insufficient ventilation, shared toilet, shower, and eating environments and limits on hygiene and personal protective equipment such as masks and gloves in some facilities. Additionally, the high rate of turnover and population mixing of staff and detainees increases likelihoods of exposure. Infections that are transmitted through droplets, like COVID-19, are particularly difficult to control in detention facilities, as 6-foot distancing and proper decontamination of surfaces is virtually impossible. United States v. Harris, --- F. Supp. 3d ----, 2020 WL 1503444, *2 (D.D.C. March 27, 2020) (citations to Declaration omitted).

There can be no dispute that the corona virus and the COVID-19 disease are circumstances not at all taken into account by the Sentencing Commission with respect to the guidelines as they are applied to Ms. Santiago. Since pandemics in general, and this COVID-19 pandemic in particular, were not contemplated circumstances, the Sentencing Commission did not consider the inherent difficulties and risks to inmates, as to both physical and mental health and wellbeing, and the consequent harsher conditions of confinement in adopting the provisions of the sentencing guidelines that result in a sentencing guidelines range that starts at imprisonment of a period of 10

months. When promulgating the guidelines that result in an advisory period of incarceration, the Commission, by definition, had to have envisioned those months of incarceration to be in a time without presence of the COVID-19 pandemic, the related impact on inmate health, the corresponding fear and anxiety, as well as the limitations of the BOP programs that result from its existence. Conversely, to the extent that prison facilities have or will institute lockdown measures to try to impact the spread of virus and the COVID-19 disease, those conditions likewise create harsher incarceration conditions that those envisions by the Sentencing Commission. Simply put, incarceration during this pandemic is substantially harsher than that envisioned by the Commission. Consequently, given that Ms. Santiago could potentially be incarcerated during substantial period of time while the pandemic continues to wreak havoc in the United States, it is respectfully submitted that these circumstances, and the resulting harsher nature of the confinement, warrant a downward departure from the recommended time period of 10 to 16 months.

### 3.      A Combination Of Factors

The Sentencing Commission contemplated that a combination of factors could warrant a downward departure, by stating that:

> The Commission does not foreclose the possibility of an extraordinary case that because of a combination of such characteristics or circumstances, differs significantly from the heartland of cases covered by the guidelines in a way that is important to the statutory purposes of sentencing, even though none of the characteristics or circumstances individually distinguishes the case.

U.S.S.G. §5K2.0, commentary.

The Second Circuit has determined that a combination of factors may constitute a "circumstance" that has not been adequately taken into consideration by the Guidelines. *See, e.g., United States v. Jagmohan*, 909 F.2d at 65 (2d Cir. 1990) (combination of employment record and unusual circumstance of commission of offense); *United States v. Broderson*, 67 F.3d 452, 458 (2d Cir. 1995). *See also United States v. Cook*, 938 F.2d 149, 153 (9th Cir. 1991) ("There is no reason to be so literal-minded as to hold that a combination of factors cannot together constitute a mitigating circumstance. [A] unique combination of factors may constitute the 'circumstance' that mitigates").

In *United States v. Rioux*, the Second Circuit recognized that "[i]n extraordinary cases,...the district court may downwardly depart when a number of factors that, when considered individually, would not permit a downward departure, combine to create a situation that differs significantly

from the 'heartland' cases covered by the Guidelines." *Rioux*, 97 F.3d at 663 (citing U.S.S.G. § 5K2.0 cmt.).[8]

While Ms. Santiago submits that the factors enumerated in this memorandum constitute a basis for a sentence below the Guidelines range independently, they certainly warrant such a sentence when considered in conjunction with one another and with the other information provided herein.  First, in addition to aberrant behavior, Ms. Santiago's good deeds and her family circumstances, it is important to note that she has lived an exemplary life, provided acts of kindness to those around her, and has been an honest and trustworthy contributing member of society.

In light of Ms. Santiago's significant contributions to her family, as well as for all the reasons stated herein, she respectfully submits that a sentence below the Guidelines range is warranted based upon a combination of factors. With this in mind, several sentencing factors support the imposition of a nonguidelines sentence. First, *Ms. Santiago's involvement in this case was completely out-of character.* This was an aberrant departure for someone in his forties. Mr. Santiago has no criminal history. Ms. Santiago was

---

[8] In *United States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996), the Court of Appeals for the Second Circuit held that the District Court did not abuse its discretion by departing downward from level 20 to a level 10, in part on the basis of Rioux's charitable efforts and civic good deeds, which included fundraising for the Kidney Foundation. *See Rioux*, 97 F.3d at 663.

not so inclined due to his generally good judgment. His introduction to crime at a relatively old age occurred not because she made a mistake trying to support her children. Her conduct was a marked departure from his otherwise good character, which she has demonstrated through the absence of a criminal record, love and loyalty toward her family and long and consistent work history. Courts have considered a defendant's good character when deciding to vary from the guidelines. See United States v. Page, 2005 U.S. Dist. LEXIS 19152, at *12 (E.D. Wis. Aug. 25, 2005) (§3553(a)(1) requires the court to consider the character of the defendant and court should consider below guidelines sentence where the defendant led an otherwise praiseworthy life); United States v. Howe, 543 F.3d 128, 133-134, 137, 140 (3rd Cir. 2008) (affirming probationary sentence and temporary home confinement for wire fraud despite an 18 to 24 month guideline range, where appellate court construed district court to have termed the offense an "isolated mistake" in the context of defendant's otherwise long and upstanding life, despite the government's assertion that he waged a two-year campaign to cover up a six-figure fraud on the Air Force). Ms. Santiago's decades-long clean record into her forties is an appropriate basis to impose a non-guidelines sentence even though his advisory range is already based in part

on CHC I. See, e.g., United States v. Huckin, 529 F.3d 1312, 1319 (10th Cir. 2008) (". . . .a district court may weigh a defendant's lack of criminal record, even when the defendant has been placed into a Criminal History Category I, in its §3553(a) analysis") (citation omitted). In United States v. Ward, 814 F. Supp. 23, 24 (E.D. Va. 1993), a departure for a 49-year-old defendant was warranted because the guidelines failed to consider the length of time that he had refrained from committing his first crime. "While awarding defendants generally and this defendant individually some credit for leading relatively crime-free lives, the Criminal History Category of the Sentencing Guidelines does not account for the length of time a particular defendant refrains from criminal conduct." Id. See also United States v. Greene, 249 F. Supp.2d 262, 267 (S.D.N.Y. 2003) ("it is highly unlikely that Greene will repeat his criminal conduct given that he is sixty-five year[s] old and previously had no criminal history points. For all of these reasons, *any* period of incarceration would be inappropriate") (emphasis in original);

*The doctrine of incremental punishment does not require additional incarceration.* Ms. Santiago has never previously been arrested, convicted or incarcerated for any offense. She is now a convicted felon and faces potential incarceration. Ms. Santiago has been fully compliant with his conditions of

release in the nearly the 16 months since her guilty plea. A lengthy

incarceration is not necessary to dissuade this 44-year-old from recidivating.

In United States v. Mishoe, 241 F.3d 214, 220 (2d Cir. 2001), the Court stated:

Obviously, a major reason for imposing an especially long sentence upon on

those who have committed prior offenses is to achieve a deterrent effect that

the prior punishments failed to achieve. That reason requires an appropriate

relationship between the sentence for the current offense and the sentences . .

. for the prior offenses. Mishoe principally addressed the career offender

guidelines, but its lesson also applies here. The concept of incremental

punishment is relevant to the sentencing goal of deterrence. Where someone

has never served a sentence of imprisonment, there is no reason to believe

that a sentence of incarceration will be more effective than a sentence of home

confinement and/or probation. See also United States v. Baker, 445 F.3d 987,

992 (7th Cir. 2006) ("[t]he district court's rationale . . . for departing from the

advisory guidelines range is adequate and premised properly on the factors

specified in § 3553(a)," including "finding that a prison term would mean

more to Mr. Baker than to a defendant who previously had been

imprisoned"); United States v. Qualls, 373 F.Supp.2d 873, 877 (E.D. Wis. 2005)

("[g]enerally, a lesser period of imprisonment is required to deter a defendant

not previously subject to lengthy incarceration than is necessary to deter a

defendant who

has already served serious time yet continues to re-offend.")


## V.   <u>CONCLUSION</u>

As recognized by the Court of Appeals for the Second Circuit in *United States v. Merritt*, 988 F.2d at 1039, "departure in the appropriate case is essential to the satisfactory functioning of the sentencing system."  This is especially true in the post-*Booker* era.  Based upon the articulated reasons *supra*, the instant case is an appropriate case for a sentence below the Guidelines range.  Therefore, due to the exemplary history and characteristics of Ms. Santiago, the unique facts and circumstances of this case, and the fact that there is no need to protect the public from her, the appropriate sentence which will provide "just punishment" is a sentence of probation. If the Honorable Court finds that a period of incarceration is necessary the Defendant requests that in light of the COVID-19 pandemic and that she is the primary caregiver for his children that she be given home confinement. Thus, the circumstances presented in Ms. Santiago's case justify a departure from the Sentencing Guidelines. More importantly, now that the decision in

United States v. Booker, 543 U.S. 220 (2005) has made the Guidelines advisory and the parsimony clause of 18 U.S.C. § 3553(a) the 13 paramount consideration, the history and characteristics of Ms. Santiago show that a period of supervision that could include home detention is "sufficient but not greater necessary to comply with" the goals of sentencing. Ms. Santiago, therefore, requests this Court to impose just that sentence.

THE DEFENDANT, Omayra Santiago

By: __ct01931_____
     Martin Minnella, for
     Minnella, Tramuta & Edwards, LLC
     40 Middlebury Road
     Middlebury, Connecticut   06762
     Phone No. (203) 573-1411
     Facsimile No. (203) 757-9313
     Email Address:  johannas@mtelawfirm.com.com
     Federal Bar No. ct01931

<u>**CERTIFICATION**</u>

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been
delivered by electronic transmission to the office of Assistant U. S. Attorney,
Margaret Donovan, 157 Church Street, 25th Floor, New Haven, Connecticut, 06510


__ct01931_____
Martin Minnella